**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Z3 PILATES ENGLEWOOD LLC and CHRISTA ZAMEL,<br><br>Plaintiffs,<br><br>v.<br><br>THE XERCIZE STUDIO, LLC,<br><br>Defendant. | Case No. 2:25-cv-02737 |
| THE XERCIZE STUDIO, LLC,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>CHRISTA ZAMEL,<br><br>Third-Party Defendant. | |

**DECLARATION OF CHRISTA ZAMEL**
**IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

I, CHRISTA ZAMEL, hereby declares as follows:

1. I am the managing member of Z3 Pilates Englewood LLC ("Z3"), plaintiff in the above-captioned action. I make this Declaration, based on my personal knowledge and review of the relevant documents, in opposition to the Motion for Preliminary Injunction by defendant The Xercize Studio, LLC ("TXS").

**Background and General Nature of This Case.**

2. Pilates is a low-impact fitness program that was developed as a rehabilitation therapy for injured dancers more than 100 years ago. It has, in recent times, become a popular form of exercise that focuses on improving muscle tone. Pilates workouts are often performed on specially designed apparatuses, including a piece of equipment invented by Pilates founder Joseph

Pilates called a "reformer." A reformer looks similar to a padded table or platform with springs, ropes, pulleys, and a sliding carriage. It can be made from different materials, including steel or aluminum. Pilates is appropriate for people of all ages seeking to improve their posture, balance and flexibility, regardless of fitness level.

3. TXS is the franchisor of a franchise system of fitness studios called "IM=X Pilates."

4. My company, Z3, had been a franchisee since 2017 pursuant to a franchise agreement between Z3 and TXS (the "2017 Agreement") and an addendum executed in 2023 (the "2023 Addendum" and, together with the 2017 Agreement, the "Franchise Agreement").

5. Under the 2017 Agreement, Z3 operated a Pilates studio located in Englewood, New Jersey (the "Englewood Studio"). Under the 2023 Addendum, Z3 operated a satellite studio originally in Rochelle Park, New Jersey and later relocated to Maywood, New Jersey (the "Maywood Studio" and, together with the Englewood Studio, the "Studios").

6. Z3 commenced this action against TXS to obtain relief for the harm caused by TXS in connection with the parties' franchise relationship. This action was commenced only as a last resort, after many months of Z3's efforts, and my efforts personally, to resolve Z3's disputes with TXS.

7. As set forth more fully herein, Z3 operated as an IM=X franchisee for over seven years but had its operations frustrated by TXS through the actions of its CEO, Elyse McNergney ("McNergney"), who repeatedly caused TXS to breach its obligations under the Franchise Agreement, imposed arbitrary and unreasonable standards on Z3, and ultimately made it impossible for Z3 to operate its business in an orderly manner. As a result, Z3 was constrained to serve TXS with a notice of termination effective April 30, 2025.

8. As demonstrated herein, Z3 provided TXS with multiple opportunities to cure its

defaults, first informally, then through counsel, then through formal mediation, and finally through litigation. At every stage, TXS, at the direction of McNergney, refused to address its material breaches of the Franchise Agreement, refused to negotiate in good faith, disregarded its own dispute resolution procedures, deliberately delayed the process at every step, and used its superior bargaining power as franchisor to pressure and intimidate Z3.

9. TXS's misconduct amounted to a pressure campaign intended to cause Z3 to relinquish its rights under the Franchise Agreement.

10. Even following termination, TXS refused to cooperate in the separation process. Instead, TXS continued in its efforts to hamper Z3's separation from the franchise and to interfere with the new businesses that began operating the Studios on May 1, 2025.

**I Form Z3, which Executes the Franchise Agreement, Purchases the Business Assets, and Begins Operation as an IM=X Franchisee.**

11. I have maintained a lifelong commitment to health and wellness. From a young age, I have been actively involved in sports and physical fitness and have continued to prioritize consistent exercise throughout adulthood. Although I do not hold a formal degree in fitness, my education and background have provided a strong foundation in understanding human well-being. Since 2009, I have owned and operated multiple businesses across various industries focused on health, fitness, and well-being. This has allowed me to develop substantial experience in entrepreneurship, leadership, and client relations. In 2010, I became a certified life coach, further aligning my professional work with my long-standing commitment to helping others improve their lives through wellness, personal development, and physical fitness. As a lifelong fitness enthusiast, I bring both practical experience and business expertise to the wellness space. My work is rooted in widely accessible and commonly practiced principles of fitness and personal development and is not dependent on any one system or brand or methodology.

12. In or about September 2017, I explored the potential acquisition of a Pilates business operating at the Englewood Studio from owner Kim DeFrancesco.

13. I was offered a turnkey, fully staffed business that included an inventory of Pilates-specific equipment including nine "reformer" machines, five MVE Pilates chairs, nine Pilates boxes with bar, nine Pilates platforms, five wall towners, and 14 Pilates rings, among other things.

14. In connection with exploring this opportunity, I came to learn that DeFrancesco operated the business pursuant to an "IM=X" branded Pilates franchise agreement with TXS or a predecessor entity of TXS.

15. My understanding is that the IM=X Pilates system was created by McNergney, and that "IM=X" stands for Integrated Movement Xercize, which TXS describes as a "complete system of over 250 sequences" or body movements. My understanding from the FDD (defined below) provided at that time was that, as of 2016, there were approximately 25 IM=X franchised locations including four in New Jersey.

16. Central to the IM=X Pilates system is a patented reformer machine called an "Xercizer." This machine forms the basis for most forms of fitness and rehabilitation programs offered through the IM=X Pilates system.

17. The IM=X system promotes a structured, systemized style that differs from the more flexible and adaptive approaches used by many independent Pilates and fitness studios. Its format is highly scripted, with instructors trained to deliver uniform class sequences using specific terminology and cueing methods.

18. In addition to offering classes, TXS also trains and certifies fitness professionals, physical therapists, and chiropractors in IM=X Pilates exercise methodology using the Xercizer reformer. TXS does not limit its training to IM=X franchisees.

19. I had never before been party to a franchise agreement, nor did I have any understanding of the legal and contractual relationships involved in becoming a franchisee. Shortly after visiting the Englewood Studio in September 2017, I was introduced to McNergney. On October 2, 2017, McNergney sent me an email with the subject line "Franchise Disclosure." Attached to the email was a document entitled "Franchise Agreement."

20. As I later learned, the document attached was **not** a franchise agreement, but was instead a Franchise Disclosure Document ("FDD"). A true copy of the email and attached FDD is attached hereto as **Exhibit A.**

21. The TXS-prepared FDD was 137 pages long and included 23 different disclosure items including model blank contract forms and several exhibits.

22. The FDD provided to me expressly differentiated between the disclosure document and the ultimate form of franchise agreement that might be entered into following the FTC-mandated 14-day waiting period from the date the prospective franchisee signs and delivers a receipt for the document. Specifically, the FDD stated that it merely "summarizes certain provisions of your franchise agreement" and that "the terms of your contract will govern your franchise relationship. **Don't rely on the disclosure document alone to understand your contract.**" (Ex. A, FDD at p. 1) (emphasis added).

23. The form of franchise agreement appended as Exhibit B to the FDD starting on page 65 of the FDD was merely a blank model. It did not contain the names of any franchisee, the franchisee location or any of the other specifically negotiated and customized terms that may be included in a final franchise agreement between a franchisor and franchisee. Moreover, the form was not signed by any representative of TXS.

24. Following receipt of the FDD on October 2, 2017, and after further discussions with

TXS personnel and DeFrancesco, I decided to move forward with the transaction.

25. On October 16, 2017, McNergney sent me an email saying she was pleased that I was joining the team and "I wanted to make sure to send you the signature pages of the Franchise Disclosure Document (FDD) [sic] so that you can sign/initial/date when you are ready to move forward." The document attached to the email was named "Christa Signature Pages" (the "Contract Document"). A true copy of the email and the Contract Document is attached hereto as **Exhibit B.**

26. I believed that the Contract Document that was presented to me constituted the complete scope of my business's contractual obligations with TXS.

27. The version of the Contract Document provided to me on October 16, 2017 was not signed by any representative of TXS.

28. Neither McNergney nor any other person affiliated with TXS provided me at any time with a customized, filled-out franchise agreement similar to the one contained in the FDD. Instead, the Contract Document McNergney sent me consisted of what appeared to be a truncated version of TXS's model franchise agreement.

29. The Contract Document sent on October 16, 2017 stated that it was the "entire agreement of the parties."

30. The Contract Document sent on October 16, 2017 did not expressly incorporate by reference the model agreement contained in the FDD.

31. I believed that the Contract Document was in fact the entirety of the franchise agreement that I was being asked to execute in order to acquire the business from DeFrancesco.

32. I responded almost immediately that I would review the Contract Document and get back to McNergney with any questions.

33. That same day, I responded by asking that the proposed area of exclusivity set forth

in the Contract Document be revised from 4 miles to 10 miles.

34. After further discussion, McNergney agreed to expand the area of exclusivity to 4.9 miles. On October 17, 2017, McNergney sent a new version of the Contract Document, the only change being on Schedule 1, which provided an exclusive territory with a 4.9-mile radius around the Englewood location. A true copy of that email and the revised form of Contract Document is attached hereto as **Exhibit C.**

35. The form of Contract Document sent to me on October 17, 2017 was not signed by any representative of TXS.

36. On October 17, 2017, I formed Z3 as a New Jersey limited liability company for the purpose of signing the Contract Document and operating the franchised business. I initially named the business “IMX Pilates Englewood LLC” and then changed it to “Z3 Pilates Englewood LLC” at the direction of McNergney. A true copy of Z3’s Certificate of Formation and Certificate of Amendment filed with the New Jersey Department of the Treasury are attached hereto as **Exhibit D**.

37. I signed the revised Contract Document on behalf of Z3 on October 17, 2017 and emailed it to McNergney. A true copy of that email and the Contract Document as executed by me (previously defined herein as the “2017 Agreement”) is attached hereto as **Exhibit E**.

38. I understand that TXS has taken the position in this case that Z3 and I are both franchisees of TXS. This was never my understanding, and it runs contrary to my purpose in forming Z3.

39. I was not provided a countersigned copy of the 2017 Agreement.

40. The 2017 Agreement signed by me did not contain any non-compete or unfair competition provision.

41. On or about October 18, 2017, after entering into the 2017 Agreement, I caused Z3 to enter into a letter of intent to acquire DeFrancesco's Pilates business. Z3 closed on that transaction on December 29, 2017, for which I paid DeFrancesco $135,000.00.

42. As a result of that transaction, Z3 became the unencumbered owner of all of the equipment included in the contract of sale, including the nine IM=X reformers.

**TXS Improperly Attempted to Terminate, and the Parties Executed the 2023 Addendum.**

43. Z3 operated the Englewood Studio as an IM=X franchisee since acquiring the business in 2017.

44. Without any warning, on January 24, 2023, TXS, through counsel, sent me a letter purporting to notice the termination of the Franchise Agreement (the "2023 Notice"), a true copy of which is attached hereto as **Exhibit F**.

45. The 2023 Notice claimed that termination was justified due to violations of purported provisions of the 2017 Agreement, including a covenant not to compete, based on the allegation that I had schemed to divert revenue to another business called Peach Farm Fitness ("PFF") and thus avoid paying royalties to TXS. It further stated that the franchise would terminate on March 25, 2023.

46. The 2023 Notice was not justified, as it was based on patently false information, including the following.

a. Contrary to the 2023 Notice, the 2017 Agreement did not contain a noncompete provision.

b. Contrary to the 2023 Notice, TXS did not "recently" discover that I operated a non-Pilates fitness studio, a cross-fit gym which was known as Reinvented Fitness ("Reinvented"). TXS had been aware of Reinvented since McNergney accessed Reinvented's website portal two years before the 2023 Notice, on or

about January 18, 2021.

c. Contrary to the 2023 Notice, neither Reinvented nor PFF had diverted any revenue from the Studios. Neither of those businesses were even Pilates studios.

d. Moreover, Reinvented was a cross-fit studio and PFF was a boot-camp-style studio. Neither had ever offered Pilates, an entirely different form of workout.

47. In its 2023 Notice, TXS purported to terminate the franchise relationship without providing an opportunity to cure, which was not permitted under the 2017 Agreement or (as I later learned) under the New Jersey Franchise Practices Act.

48. To address the 2023 Notice, I retained an attorney for Z3 and myself. [1] On February 14, 2023, my attorney responded to the 2023 Notice, advising TXS that the 2017 Agreement did not contain any non-compete or unfair competition provision. A true copy of the letter from my attorney, with attachment, is attached hereto as **Exhibit G**.

49. On February 15, 2023, counsel for TXS responded with an email stating that "the attached FDD contains the executed and countersigned FA." A true copy of counsel's email and attached FDD are attached hereto as **Exhibit H**.

50. That document, however, appeared to be a new, reconstructed version of the 2017 Agreement signed by me, cobbled together after the fact by TXS with some form of the model franchise agreement used in an FDD. However, the pages of that model agreement do not match the 2017 Agreement signed by Z3. For example, Article 23 appears on two different pages (PDF pp. 92-93).

51. Moreover, the countersignature on that document by TXS representative Lauren

---

[1] We have retained new counsel in this matter, as previously we were represented by the Honorable Paul J. Halasz, J.S.C. prior to his confirmation to the Superior Court of New Jersey.

Fakete (PDF p. 92) is dated "October 2, 2017." There is no way that Fakete could have signed the document with my signature on it before October 17, 2017, when I signed the Contract Document.

52. Prior to the purported termination date, the parties entered into a Tolling Agreement that suspended the termination date through and including June 8, 2023.

53. In an effort to narrow the dispute between the parties, I closed both of the PFF businesses and ceased all PFF-related activities.

54. The parties resolved TXS's threatened termination through the execution of a First Addendum to Franchise Agreement effective June 5, 2023 (previously defined herein as the "2023 Addendum"), which contained mutual releases and provided for the withdrawal of the 2023 Notice of Termination. A true copy of the Addendum is attached hereto as **Exhibit I**.

55. The 2023 Addendum further provided that TXS released the purported noncompete agreement as to the operation of Reinvented, and that Z3 would open a satellite location inside Reinvented and purchase three reformers from TXS's affiliate "at their current and regular prices," excluding shipping.

56. Although the 2023 Addendum refers to a "Franchise Agreement" that was "attached hereto and incorporated herein as Exhibit A," the Addendum I signed was simply the three-page document, with nothing attached to it.

**From the Moment We Signed the 2023 Addendum, TXS Routinely Overcharged for Royalty Fees and Other Fees to Pressure Z3 to Abandon the Franchise.**

57. In July 2023, less than a month after the parties resolved the purported 2023 Notice of Termination and executed the Addendum, TXS—at the direction of McNergney—acted in apparent retaliation against me for defending Z3 and myself in the dispute.

58. As the following paragraphs show, TXS's retaliation was willful and wanton, and came in several forms, all of which were designed to (a) withdraw excess funds from Z3's bank

account and (b) drive Z3 out of the franchise so it could be replaced with another franchisee.

59. In particular, TXS systematically overcharged royalty fees to Z3, unilaterally withdrew the excessive amounts from Z3's bank account, and refused to refund the overcharged amounts when discovered.

60. Although the 2017 Agreement (Ex. E) does not contain a provision for royalty fees, TXS had informed me at the outset of the relationship that the royalty fee for the Englewood Studio was equal to the greater of $695 per month or 6% of Z3's monthly sales.

61. Paragraph 6 of the 2023 Addendum provides for a similar calculation for the Maywood Studio:

> **Separate Monthly Royalty Fee:** Beginning two (2) months after Franchisee has received the Xercizers referenced in paragraph 5, above, Franchisee shall pay Franchisor a separate, additional Monthly Royalty Fee for the Satellite Franchised Business [referring to the Maywood Studio]. The Monthly Royalty Fee shall be the greater of either $695 per month, or 6% of Franchisee's gross monthly sales each month for the goods and services related to the Satellite Franchised Business. The Satellite Franchised Business is exempt from all other reoccurring monthly fees due under the Franchise Agreement.

Ex. I at 2, ¶ 6 (emphasis in original).

62. The royalty calculation was based on reports generated by the Mind Body Online ("MBO") business management software used in the IM=X system. True copies of Z3's MBO for are attached hereto as **Exhibit J,** comprised of **J-1** and **J-2**.

63. TXS routinely requested and received copies of Z3's bank statements to confirm the amounts reported through MBO.

64. TXS collected royalty fees through Automated Clearing House (ACH) or similar system that withdrew funds from Z3's business account without Z3's involvement.

65. In June 2023, the Englewood Studio generated $15,372.00 in sales, rounding up to

the nearest dollar ($15,774.25 minus $402.32 tax = $15,371.93). $15,372.00 multiplied by 6% is $922.32. Ex. J-1 at 23.

66. In early July 2023, TXS charged and unilaterally withdrew from Z3's bank account royalty fees for June 2023 in the amount of $1,185.00, representing an overcharge of $262.68, or over 28% more than the correct amount for that month.

67. By email dated July 5, 2023, I notified TXS of the overcharge. (That email calculated the June royalty figure as $946 rather than $922.32, by using the "pre-tax" figure, but $1,185.00 represents an overcharge of more than 25% regardless.) A true copy of the email, with response from McNergney, is attached hereto as **Exhibit K**.

68. In response, McNergney stated: "Hi - Kerry is not in this week but she asked me to request your bank statements for this year. She wants to double check her calculations. Thanks much." Ex. K.

69. I sent Z3's bank statements as requested.

70. In response, TXS sent an email dated July 14, 2023 with subject line "Royalty reimbursement $19.74 but...," a true copy of which, without attachments, is attached hereto as **Exhibit L**.

71. In the email, McNergney stated that TXS had recalculated the June royalties based on the bank statements, and also did "a mini-desktop audit from Jan to June." Ex. L at 1.

72. The email attached an Excel file named "Christa.xlsx" that contained new royalty calculations, which incorrectly stated that Z3 had underpaid June 2023 royalties by $19.74.

73. I responded, advising that TXS's new calculation was not accurate, and that I was owed $148.14 for the June 2023 overcharge and $344.00 for the last six months of overcharges. Ex L at 1.

74. Although McNergney admitted the error, she refused to have TXS provide a refund for the overcharge and, instead, invented a new charge to offset it. By email dated July 17, 2023, she stated that TXS "made a visit [to Z3's Studios] last Feb but did not charge for it," and asked, "Could we simply call it even?" Ex. L at 2.

75. I responded, "I'd like my royalties calculated accurately and reimbursed accordingly. Also, please let me know why the royalties are being calculated including tax when it should only include sales. An adjustment needs to made [sic] there." Ex. L at 2.

76. McNergney responded: "An onsite visit is usually ~$500 but we had not yet charged for it. Renee's upcoming support visit was also going to be free of charge. Kerry knows to work off the bank statement with the tax deducted going forward. **Again - would you like us to bill you for the onsite visits or call it even.**" Ex. L at 3 (emphasis added).

77. McNergney's threat was a clear ultimatum: Either allow TXS to retain the overcharged amount, or TXS would punish Z3 with new charges, in even larger amounts.

78. I responded by flagging McNergney's tactic:

> You were aware your accounting was being done incorrectly and yet had no issue telling me you would deduct $19.74 next month when you thought it was owed to IMX. Yet when I pointed out the royalties were done incorrectly, I suddenly owe you $500. Frankly I find this tactic very discouraging and disheartening given you keep stating you want to move on with a fresh slate.

Ex. L at 3.

79. McNergney responded: "Hi - This was a 1x mistake in 6 years. Kerry please make sure to deduct the taxes like you have been doing every month for six years. Christa - sorry for the one time error. **Kerry - please reduce the onsite inspection invoice from the trips to the Peach Farms as paid.**" Ex. L at 4 (emphasis added).

80. McNergney's response was patently false, ignoring the six months of prior

miscalculations that I had just identified. TXS, meanwhile, had never issued the supposed $500.00 "onsite inspection invoice" to Z3. To date, I have never seen such an invoice, nor was such an invoice permitted under the Franchise Agreement. From all appearances, McNergney was fabricating the invoice and then pretending to mark it "paid" to avoid refunding the overcharged June royalty.

81. To this day, TXS never refunded the overcharged amount for June 2023.

82. TXS continued to overcharge its royalty fees throughout the latter half of 2023.

83. Z3's August sales totaled $13,756.05 ($14,106.66 - $350.61), 6% of which is $825.36. Ex. J-2 at 23).

84. TXS charged $1,544.00, an overcharge of $718.64 or 46.5%.

85. By the end of 2023, TXS had overcharged Z3 royalty fees in an approximate total amount of $2,142.12.

86. By email dated January 6, 2024, I notified TXS of overcharges totaling $1,726.23 for the months between August and December 2023. A true copy of the email, with response from McNergney, is attached hereto as **Exhibit M**.

87. An exchange followed in which McNergney attempted to blame the errors on Z3's use of one MBO account for the two Studios. Ex. M at 6.

88. I reminded McNergney that she had permitted the sharing of accounts as part of the resolution of the 2023 Notice. Ex. M at 7. Nevertheless, in good faith, I offered to address the alleged problem:

> Regarding setting up a second location on MBO and a separate bank account. We had agreed at the time of settlement that I could operate both locations under one account so that I wouldn't incur even more additional costs. However, it seems to be causing confusion so I am currently looking into adding the second location in MBO (also in the hopes of getting more class pass clients). I will contact Katie this

> week about it.

Ex. M at 7.

89. McNergney ultimately apologized for the error. Ex. M at 9.

90. I offered to open a separate bank account for the second Studio. Ex. M at 9. McNergney responded: "If the MBO for each location goes onto the one bank account, that would work." Ex. M at 10. She responded further: "Sorry - let me double check on that....for now it is ok but want to double check." Ex. M at 10. I did not hear back from McNergney about the issue.

91. TXS continued to overcharge royalty fees for several months in 2024, particularly for August 2024 and December 2024 royalties.

92. By email dated September 10, 2024, I notified TXS of the overcharge of August royalties. A true copy of that email and the email chain that followed is attached hereto as **Exhibit N**.

93. I wrote to TXS, stating:

> Hope all is well. You deducted $1996 from my account for royalties. However it's $484 over. Royalties from last month should be around $1512. My total sales for Englewood minus taxes was $13619.78 and for Maywood $3110.26. Please credit back the overage. Is it possible to get a royalty statement sent each month to see your break down?"

Ex. N at 3.

94. On September 11, 2024 at 1:11 PM, after an exchange with TXS's accounting department, McNergney admitted the error and stated, "We will refund the difference." Ex. N at 2.

95. That same day, at 1:33 PM, McNergney wrote again, having found another way to avoid refund the overcharge:

> Hi - Let's please replace your Xercizers of 13 years of age with new springs. Again you did replace one set in 2019 and another in

> 2021...those technically should be replaced too. But let's at least get 8 sets off to you within the next month or two. Again this is a requirement and critical to the resistance level and safety of the program. We are providing a super discounted price. Please see the invoice attached.

Ex. N. at 1.

96. The invoice charged $250.00 per spring.

97. The Franchise Agreement does not contain a provision requiring springs. Paragraph 6.22 of TXS's form franchise agreement in the FDD provided that the springs would cost $220.00. Ex. A (FDD), at FDD Ex. B (form agreement), at 9 (PDF p. 74).

98. On September 16, 2024, McNergney revised the price of the springs from $250.00 to $220.00 and sent a new invoice. Ex. N at 4-5.

99. I noticed that McNergney had increased the shipping price from $18.00 apiece in the original invoice to $27.50 apiece in the new one. I requested that it be corrected: "Thanks for looking at the agreement. I also saw that it states the charge is $220 per set. I also noticed the shipping price increased from $18 a set quoted on your original invoice to $27.50 on the latest invoice. I'd appreciate if the original shipping quote be honored." Ex. N at 4.

100. McNergney refused: "Hi - We can not lower the shipping costs." Ex. N at 5.

101. On multiple occasions since June 2023, McNergney suggested that I sell Z3's business to another franchisee. One example occurred when I was emailing with a TXS staff member about marketing opportunities. A true copy of the email exchange from October 6, 2024 to October 18, 2024 is attached hereto as **Exhibit O**.

102. The discussion was polite and professional.

103. However, on October 16, 2024, McNergney entered the conversation, directing the following to me: "Hi - We are going to correct your MBO account to reflect our model and delete the entries that you made below. I am not sure why you keep reinventing my brand when you never

learned it to begin with. **Maybe it is time you sell!**" Ex. O at 2 (emphasis added).

104. I responded:

> I find both your tone and comments below unnecessary. Your brand has not been reinvented. I added more limited membership options based on client feedback. I saw Sam was using the weekly pricing option method and opted to do the same with the sole purpose of attracting more clients. Clients are still charged monthly. I did add names to differentiate the options even more. If this is reinventing your model, I apologize. I did not realize it would be an issue. All you simply needed to do was tell me. I will remove them and revert to the standard name. I have been trying very hard to reengage with IMX and grow both studios despite past issues. I am hoping you are just having a having a [sic] bad day, and that it gets better. If there are other issues please let me know so that I can rectify them.

Ex. O at 1.

105. McNergney continued to berate me, saying (among other things): "If you were making $600k per year then we would conform to your ideas but the reality is that you are not doing so well and we have reached out many times to give advice on how to grow your IMX business." Ex. O at 1.

**<u>In January 2025, I Bought Another Overcharge to TXS's Attention, and TXS Responded by Serving a Notice of Default.</u>**

106. When TXS overcharged Z3 for December 2024, I notified TXS once again. A true copy of an email chain from December 15, 2024 to January 21, 2025 is attached hereto as **Exhibit P**.

107. By email dated January 12, 2025, I notified McNergney that I had been notifying TXS of the December 2024 overcharge with no response. I further stated: "My royalties were over charged again. The overage amount is $444. I was debited $2225. It should be $1781. The Englewood royalty should be $1086 and the Maywood royalty is $695. Please refund the difference of $444. Thank you." Ex. P at 2.

108. McNergney ignored the overcharge issue.

109. Instead, on January 21, 2025 at 4:56 PM, she sent me an email with subject line "For our records: Default Letter," and an attached file named "ChristaDefaultAGAIN.pdf," which was a letter purporting to give notice of multiple defaults by Z3 (the "2025 Notice"). A true copy of the email and attached 2025 Notice are attached hereto as **Exhibit Q**.

110. In the email, McNergney stated: "I only send the attached because after speaking with my attorney - she thinks for good reason we have to make the legal record of these issues. Our agreement terms have been expressed to you in several prior default letters and yet you still are not in compliance." Ex. Q at 1.

111. Z3 had not received "several prior default letters." In fact, this was the first notice of default Z3 had ever received. The only formal notice of any sort that Z3 had received previously was the 2023 Notice purporting to notice termination.

112. The 2025 Notice set forth multiple purported defaults based on various paragraphs from the form franchise agreement in TXS's 2016 FDD, none of which are found in the Franchise Agreement I signed. Ex. Q at 2.

a. The first alleged default was a purported failure to comply with a requirement that "you or some of your staff complete the course requirements as prescribed." The 2025 Notice provided four months for Z3 to meet the unspecified requirements.

b. The second alleged default was a purported failure to "engage in marketing" until reaching an unspecified "membership goal."

c. The third alleged default was a purported failure for the Studios to be open for 50 hours per week.

d. A fourth provision is cited (Article 6.4) but no default is alleged.

113. I responded the same day, addressing the purported defaults but continuing to seek a resolution to TXS's ongoing miscalculations of fees: "Regarding my royalties, it would be much easier for all franchisees if the calculations were uniform and transparent every month to avoid questions or discrepancies." A true copy of my response is attached hereto as **Exhibit S**.

114. My response also highlighted McNergney's recent urging for me to abandon the franchise. "Further, you have mentioned more than once now that you would like me to sell." Ex. S at 1.

115. My response further noted that McNergney's conduct was disheartening in light of my recent investments into the Studios. Ex. S at 1. In fact, several years ago, I had requested to sell the Studios, first during the Covid-19 pandemic when it was very difficult to maintain the business, and more recently after McNergney sent the 2023 Notice. Following the execution of the 2023 Addendum, however, I had reinvested in the Englewood Studio and established the Maywood Studio, and McNergney was repeatedly suggesting I sell.

116. My response concluded:

> If your goal is to terminate my contract or take on more legal action, I will explore the options to sell and confer with my attorney once again about litigation.
>
> If, on the other hand, you truly want to help and see the studio grow (which I hope you do), let's schedule a call and come up with ways to do that. Rather than putting energy into insults and arguments, let's put that energy into something positive and transparent, i.e. revenue growth. I don't want to keep being at odds with you. The studio is in a good position currently. Working together amicably has the potential to raise the revenue substantially.

Ex. S at 1.

117. McNergney did not respond.

118. At 5:03 PM on January 21, 2025 (less than 10 minutes after she sent the 2025 Notice), McNergney sent a separate email in which she fabricated another new charge: "But you

have changed the model a lot within the MBO system and it may require that we pay our tech to reconfigure the issues. Per your agreement it will be about $200 only." Ex. P at 1.

119. I responded by asking "what needs to be reconfigured" and "where that charge is in the agreement." Ex. P at 1.

120. McNergney responded by stating: "Hi - Please see the attached and let's adjust to make the offers more inline with the model. And - everyone needs to be certified." Ex. P at 1. The attachment was simply an updated pricing sheet for IM=X memberships. There was nothing for a "tech" to "reconfigure."

121. On February 6, 2025, I once again emailed TXS about the overcharge of December royalties in the amount of $444. A true copy of the email chain is attached hereto as **Exhibit T**.

122. McNergney responded but did not agree to refund the overcharge: "Your statements are attached with the calculations. Kerry is working off your bank statements and MBO too per your franchise agreement -- which you should realize that she has not been adding the zero services back to the MBO reports. Our franchise agreement specifies that we have the right and option to add these back. The totals are written on your bank statements." Ex. T at 1.

123. The phrase "zero services," also called "comps," refers to services provided to customers at no cost.

124. Contrary to McNergney's response, Z3 did not offer services at no cost.

125. McNergney continued: "I still would appreciate a reply to my prior email and the cure of your defaults regarding training." Ex. S. Contrary to McNergney's suggestion, I had already replied. Ex. T at 1.

**Z3 Made a Final Attempt to Resolve the Dispute, Following TXS's Preferred Dispute Resolution Procedures, but TXS Continued in Its Course of Misconduct.**

126. Just days after sending the 2025 Notice, TXS overcharged Z3 for January 2025

royalties in the amount of $277.25. Z3 was therefore constrained to retain counsel who, on February 19, 2025, sent a letter to TXS's counsel providing further notice of TXS's breaches of the Franchise Agreement, further responses to each of the purported defaults in TXS's 2025 Notice, and a proposed resolution that would include the ending of the franchise relationship. (Declaration of Jesse C. Morris, Esq. dated May 19, 2025 ("Morris Decl."), Ex A).

127. In the letter, my counsel specifically referenced the "repeated and intentional miscalculation of royalties," and the charging of improper fees. *Id.* at 1. Counsel noted that TXS had further violated the Franchise Agreement by unfairly retaliating against Z3 for raising those breaches with TXS. *Id.* at 1-2. Counsel also responded to the multiple purported defaults set forth in the 2025 Notice. *Id.* at 2-3. Counsel suggested that the parties agree to a mutual termination of the Franchise Agreement. *Id.* at 3.

128. Finally, my counsel specifically demanded mediation pursuant to Section 17.9 of the Franchise Agreement, based on the provision in the FDD. *Id.* at 3. Counsel noted, however, the issue of whether certain provisions were actually part of the Franchise Agreement, and that therefore references to the provisions were "made without waiving my clients' right to dispute the applicability of one or more provisions insofar as they were not part of the parties' agreement." *Id.* at 1 n.1.

129. Although the Franchise Agreement does not contain the "Section 17.9" referenced in counsel's letter, I understand that TXS's form agreement in the FDD provided that a franchisee must attempt to mediate for 60 days. Ex. A (FDD) at Ex. B, p.21 § 17.9. To avoid disputes over the applicability of the provision and in a showing of good faith, I attempted through counsel to mediate with TXS in accordance with the model Section 17.9 in the FDD.

130. On February 28, 2025, McNergney emailed Z3's counsel directly, attaching a letter

dated February 26, 2025. (Morris Decl., Ex. D).

131. McNergney's letter did not respond to the demand for mediation.

132. McNergney's letter cited to multiple provisions not contained in the Franchise Agreement, such as §§ 4.1, 5.4, 6.2.1, 6.5, 10.1.5, 10.1.6, 10.4.6, and 17.11.

133. It also contained a multitude of misstatements:

a. It stated: "Zamel's accusation that TXS of [sic] overcharging her royalties is a ridiculous and fraudulent claim made as a manipulation so she can 'get out' of the franchise obligations and operate in competition with TXS." (*Id.* at 2).

b. It repeated her false claim that Z3 was providing "comps," referring to services provided to customers at no cost: "If anything, Zamel has been undercharged since $0 comps have not been added back regularly." (*Id.* at 2).

c. It falsely suggested that I had not attended training, which I did at the time Z3 began operating.

d. It falsely stated that "[w]hen Zamel opened her 2nd franchised business she did not separate the funds with two bank accounts as required." (*Id.* at 2). That statement is belied by the fact that we had agreed that Z3 could utilize one account for both Studios and that, over a year ago, when I had nevertheless offered to use separate bank accounts, she had indicated that it was not necessary. Ex. M at 7, 9-10.

e. It falsely stated that Z3 had included "ClassPass" clients as members, which it never did.

In sum, McNergney's letter failed to identify any genuine defaults.

134. McNergney's letter also attached the invoice for the springs again containing the

up-charged shipping fees that I had caught when she first sent it. See Ex. N at 4.

135. McNergney's letter also stated:

> Furthermore, we have a lot of growth in the north east of which all owners are in good standing with the franchisor and very successful; thus **we would like to be able to sell this territory if she is going to close down**. It would not be good business practice allow Zamel to continue to operate in the territory with our proprietary equipment being used under another name. That would be interference with our business which Zamel knows, as she was properly disclosed.
>
> This is the reason we suggested a transfer of the franchised business.

(Morris Decl., Ex. D at 5).

136. McNergney's letter also states:

> The franchisor would like to point out for the record the reason for Zamel's prior default and include information surrounding such dispute and the ensuing settlement agreement. Zamel – in violation of her franchise non-compete formed two brands "Peach Farm Fitness" and "Reinvented Fitness". Maybe TXS should have terminated her without opportunity to continue or cure.

(*Id.* at 5).

137. On March 1, 2025, McNergney sent an email to me and not my counsel, a true copy of which is attached hereto as **Exhibit U**. Her email stated that Z3 was liable under the Franchise Agreement for TXS's legal fees because it "contacted a lawyer":

> Hi - I wanted to make sure that we alert you to the following in your agreement with us.
>
> 17.8 **Internal Dispute Resolution.** You must first bring any Claim to our CEO, after providing notice as set forth in Section 17.7 above. You must exhaust this internal dispute resolution procedure before you may bring your Claim before a third party.
>
> **After our request that you follow the system or cure your defaults, you immediately contacted a lawyer to send two letters vs reaching out to us for resolution thus you are liable for our legal fees.**
>
> Please reach out to us to stop this unnecessary process for which you

> will be held liable since there is no reason for you not to simply cure your defaults.

Ex. U (second emphasis added).

138. On March 5, 2025, McNergney sent an email to me and my counsel. A true copy of the resulting email chain, without attachments, is attached hereto as **Exhibit V**. The email began:

> Christa
>
> Hi - I am kind of tired of paying legal and accounting bills that should not occur (ie our 6 month dispute from Jan 2023 and settled June 2023) and now this one. As you know you always have the opportunity to read and follow your franchise agreement for your two locations. I guess your most recent claim is that our accounting department is not accurately charging you royalties but have you examined your own reporting?

Ex. V at 3.

139. From that paragraph, I understood McNergney to be (a) expressing her apparently continuing anger about our dispute in 2023 that she had initiated and I had defended against, and (b) creating a false record that I had not been raising the issue of miscalculations since July 2023.

140. McNergney's March 5 email repeated the same sort of misstatements and dodges that by now were familiar, such as that Z3 had offered "comps," which it does not offer. She directed me to "do your own analysis of what you think the franchisor has overcharged," despite the fact that I had been providing TXS with my calculations. Ex. V at 3.

141. She continued to make a false record in the email: "For your notes: We gave you $484 towards your spring order thus reducing the bill from $1980 to $1496 as a courtesy." Ex. V at 3. TXS had not given the $484 credit as a "courtesy." It was a refund of the August 2024 royalty overcharges that McNergney had admitted to. Ex. N at 2-3.

142. McNergney concluded her March 5, 2025 email by threatening more charges against Z3:

> Please explain in detail to us what has been overcharged since that is not our records and **the next step would be an audit which I am sure you do not want to pay for per your franchise agreement**.
>
> Thanks for sending me the detailed response.

Ex. V at 3 (emphasis added).

143. Z3, through counsel, initiated mediation with the American Arbitration Association ("AAA") on Friday, March 7, 2025.

144. On Monday, March 10, 2025, I learned from my counsel that TXS intended to serve a notice of termination on Z3 for breaching the Franchise Agreement by operating a competing business called "mom 'n' tot spot" ("MNTS").

145. I formed MNTS in 2023 to operate a non-competing business after closing PFF, which had been located there when TXS served the 2023 Notice, which closed before the dispute was resolved through the execution of the 2023 Addendum, and which resulted in a lease obligation.

146. MNTS's business never competed with the Studio. It was an indoor playground for toddlers.

147. MNTS was not successful and closed permanently in mid-2024.

148. By all appearances, TXS's CEO had discovered the supposed competitive business by searching online over the weekend for a pretext for terminating Z3, and had found old social media posts where I had attempted, unsuccessfully, to cross-sell IM=X Pilates at the Englewood Studio next door to parents bringing their children to MNTS.

149. TXS never issued the threatened notice of termination.

150. The threatened termination, coming as it did just one business day after Z3 filed for mediation, struck me as yet another retaliatory action by TXS to punish me for asserting Z3's rights as a franchisee, and to increase pressure on me not to assert its rights further.

151. As of March 20, 2025, TXS had not paid its half of the AAA fee for the mediation.

**Z3 Terminates the Franchise Agreement and Transitions the Studios out of the Franchise.**

152. On March 20, 2025, Z3, through counsel, served TXS with a Notice of Termination (the "Termination Notice"), a true copy of which is attached hereto as **Exhibit W**.

153. The Termination Notice established April 30, 2025 as the effective date of termination, to provide the parties time to work cooperatively together and effectuate a smooth transition.

154. On March 20, 2025, Z3, through counsel, initiated this action in the Superior Court of New Jersey, Law Division, Bergen County. We provided notice of the Complaint to TXS but refrained from serving TXS so that Z3 could continue to follow TXS's standard dispute resolution process before proceeding in Court. (Morris Decl., Ex. F).

155. On March 24, 2025, TXS, through counsel, stated that it would pay the AAA filing fee: "The filing fee will be paid. There is no waiver of the mediation provision." (Morris Decl., Ex. G). TXS and Z3 each paid their half of the AAA fee shortly thereafter.

156. On March 25, 2025, McNergney on behalf of TXS and I on behalf of Z3, with the parties' respective counsel, met via Microsoft Teams. The goal was to work on resolving the dispute before moving further in mediation.

157. At the meeting, we reviewed documents that had been exchanged by the parties. McNergney once again accused Z3 of providing "comps," so we reviewed relevant portions of MBO reports identified by McNergney, and I indicated where all customers had paid. My impression was that this resolved the "comps" issue once and for all.

158. On March 26, 2025, the AAA circulated a Mediator Selection List to counsel for Z3 and TXS. I worked with my attorney to make selections.

159. On March 27, 2025, I received an email ostensibly from a staff person at TXS's

which, based on its tone, content, and context, was plainly written by McNergney and sent at her direction. A true copy of the March 27 email is attached hereto as **Exhibit X**. It stated that I "will be leaving the system soon" and suggested that TXS will be contacting my instructors to move them to other franchise locations.

160. Moreover, the email indicated that TXS would not provide my instructors with certifications despite their having taken the training:

> As you know, the tuition free education/ certification is only available to instructors who are currently employed by an IM=X® studio, so I'd like to reward the hard work by referring them to other studios to assist in finding them a new IM=X® home so they can complete their IM=X® Basic certifications, and not lose out on the time and money already invested. We feel it would be unfair for them to be penalized by this development, and want them to be able to continue if that is their preference.

Ex. X at 1-2. ¶

161. This represented an attack on Z3's employees. Although TXS refers to its training as "tuition-free" for franchisees and their instructors, that is not entirely true. TXS charges an "exam fee," without which TXS will not provide an exam or a certification. TXS also charges for training materials.

162. One of Z3's instructors had paid for two exams for two certifications ($250.00 total), completed the courses, and had already passed one exam—for what TXS calls the "Basic Xercizer Certification"—prior to March 27, 2025, the date of the email. The instructor was therefore already entitled to that Certification. Despite this, TXS was refusing to provide the certification, as one more instance of retribution against Z3.

163. By this point, TXS had demonstrated that it was not going to end its bullying and threatening tactics.

164. Accordingly, on March 27, 2025, Z3 responded to the email through counsel, who

requested that TXS "immediately cease all such conduct and that all further communications . . . be handled through counsel." (Morris Decl., Ex. H).

165. TXS did not respond.

166. Later that day, TXS, though counsel, emailed the AAA to request an extension to April 1, 2025 to select a mediator. Z3 consented to the extension but not to an extension of the 60-day mediation period. On April 1, 2025, TXS unilaterally cancelled the mediation. (Morris Decl., Ex. I at 1).

167. TXS disregarded Z3's request to handle further communication through counsel. By letter dated April 11, 2025, Z3 repeated the demand, through counsel. (Morris Decl., Ex. J).

168. TXS refused the request. (Morris Decl., Ex. K).

169. Since being served on March 20, 2025 with the Termination Notice (Ex. X), TXS never requested that the April 30, 2025 effective date be rescheduled to an earlier or later date.

170. As a protective measure, Z3 removed TXS's authorization to unilaterally withdraw funds from Z3's bank account. However, Z3 paid all TXS royalty fees for March and April 2025, and as of this date TXS has made no objection to the amounts Z3 calculated and paid.

171. Z3 continued to fulfill its obligations under the Franchise Agreement at all times prior to the April 30, 2025 termination date.

172. New entities (the "Buyer Entities") were formed for the purpose of purchasing Z3's assets and changing ownership as part of the transition of the Englewood Studio and Maywood Studio from IM=X-branded Pilates studios to a new "Z3Energy" brand of studios.

173. On April 7, 2025, Z3 entered into a Letter of Intent ("LOI") to sell its assets at the Englewood Studio and the Maywood Studio to the Buyers Entities, and an Interim Management Agreement ("IMA") to permit the Buyer Entities to operate the Z3Energy Studios prior to

execution and closing of the agreements contemplated by the LOI.

174. The Buyer Entities began operating the Studios on May 1, 2025 pursuant to the IMA, but Z3 remains the owner of the business assets and is the named tenant on the leases.

175. I understand that the motion filed by TXS seeks to enjoin me, and Z3, from competing with TXS. For that reason, whether I will be owner in whole or in part of the Buyer Entities, or whether they will be owned entirely by third parties depends largely on the outcome of this motion and the action generally.

176. Within one to two weeks of the April 30, 2025 termination date, the Buyer Entities advised Z3's clients and the public of the opening of the Z3Energy Studios.

177. Z3 advised its clients that, if they preferred to move to an IM=X-branded studio after the transition, Z3 would assist in identifying options in the clients' area. A true copy of one such communication is attached hereto as **Exhibit Y**.

178. Z3Energy offers a modern, flexible approach to Pilates-inspired fitness that is distinct from the structured, scripted format of IM=X. Our methodology emphasizes functional movement, strength, stretch, and stamina, blending classical Pilates principles with contemporary training techniques tailored to meet the needs of a diverse client base. Unlike IM=X, which requires instructors to follow set class sequences and branded protocols, Z3Energy empowers its instructors to teach dynamically, drawing from widely accepted industry knowledge, evolving fitness trends, and client feedback. Our classes are designed to be progressive but not fixed—allowing for variation, creativity, and personalized instruction based on real-time client performance and goals. We focus on delivering high-quality, results-driven programming through independently developed formats that prioritize strength, control, and full-body engagement. Our training style is intentionally versatile, welcoming individuals at all fitness levels while promoting

consistency, confidence, and long-term physical wellness.

179. TXS's Xercizer machine is available for sale to the general public. A true screenshot of TXS's website advertising its Xercizer is attached hereto as **Exhibit Z**.

180. However, Z3Energy studios is seeking to replace the Xercizers with newer, slimmer models that are more appropriate for Z3Energy's program.

181. Z3Energy studios do not utilize any teaching materials or methods owned by TXS.

182. Within the IM=X system, instructors were difficult to hire because TXS required them to enroll in 20 hours of IM=X-specific training courses and to pay hundreds of dollars in exam fees for each certification. The Z3Energy studios are specifically focusing on utilizing instructors with backgrounds and certifications in non-IM=X Pilates.

183. I learned from Z3's former instructors that TXS is seeking to solicit them to leave the Z3Energy studios and work for TXS's other IM=X-branded studios. Through counsel, Z3 served TXS with a cease-and-desist letter dated May 9, 2025. Morris Decl., Ex. L).

184. Pilates is a widely recognized and practiced system of physical fitness developed by Joseph Pilates in the early 20th century. It emphasizes core strength, flexibility, posture, controlled movement, and breath awareness. Pilates can be performed using specialized equipment such as the reformer or on a mat, and is taught in thousands of independent studios, fitness centers, and rehabilitation clinics worldwide.

185. Over time, Pilates has naturally evolved to include a broad range of contemporary variations. These include athletic conditioning, high intensity training, strength integration, and fusion formats, all grounded in the foundational principles of the method. These modern adaptations are taught and refined by countless instructors, studios, and training programs without reliance on a single methodology or proprietary system.

186. As such, no single company or brand, including IM=X, can claim exclusive ownership or rights to the general methodology, principles, or progression of Pilates-based fitness. The techniques used by independent studios reflect a common and widely accessible body of knowledge within the fitness industry and are not dependent on IM=X's system or materials.

187. For the purposes of the New Jersey Franchise Practices Act, I confirm that the performance of Z3's franchise was at all times contemplated and/or required Z3 to be located in the State of New Jersey as required by N.J.S.A. 56:10-4(a)(1), that Z3's gross sales were approximately $290,257.50 for the 12 months preceding the institution of this action, thereby exceeding the $35,000 minimum requirement under N.J.S.A. 56:10-4(a)(2), and that 100% of Z3's gross sales were intended to be and were derived from the franchise, thereby meeting the 20% requirement under N.J.S.A. 56:10-4(a)(3).

188. Z3's final calculation of overcharged royalty fees that were withdrawn from Z3's bank account by TXS between June 2023 and February 2025 showed a total of $3,218.71.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 19, 2025

CHRISTA ZAMEL